# 23-12715

# United States Court of Appeals
*for the*
# Eleventh Circuit

LIBERTY SURPLUS INSURANCE CORPORATION,

*Plaintiff/Counter Defendant/Appellee,*

— v. —

KAUFMAN LYNN CONSTRUCTION, INC.,

*Defendant/Counter Claimant/Counter Defendant/Appellant,*

UNITED GLASS SYSTEMS CORP.,

*Defendant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO: 9:22-cv-80203-DMM
(Hon. Donald M. Middlebrooks)

## INITIAL BRIEF OF APPELLANT

GREGORY D. PODOLAK
JONATHAN CHAMBERS
SAXE DOERNBERGER & VITA, PC
999 Vanderbilt Beach Rd, Ste 603
Naples, FL 34108
(239) 315-4215

Eve-Lynn Gisonni
Stacy Manobianca
Rachel Pearson
Leena Phaguda
SAXE DOERNBERGER & VITA, PC
35 Nutmeg Dr, Ste 140
Trumbull, CT 06611
(203) 287-2100
*Counsel for Defendant/Appellant*

*Kaufman Lynn Construction, Inc. v. Liberty Surplus Ins. Corp.*,
Case No. 23-12715-F

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1(a), Appellant Kaufman Lynn Construction, Inc. ("Kaufman"), a non-governmental party, hereby states that it is not a subsidiary or affiliate of a publicly owned corporation, there is no publicly owned corporation, not a party to this appeal, that has a financial interest in the outcome of same, and there is no parent company or publicly held corporation that owns 10% or more of Appellant's stock. Kaufman further discloses all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party as follows:

1. Blevins, F. Bryant

2. Butler Weihmuller Katz Craig LLP

3. Chambers, Jonathan W.

4. Friedman, Warren E.

5. Kaufman Lynn Construction, Inc.

6. Liberty Surplus Insurance Corporation

7. Manobianca, Stacy M.

8. Middlebrooks, Donald M.

9. Munoz, Freddy X.

10. Pearson, Rachel S.

11. Peckar & Abramson, P.C.

12. Podolak, Gregory D.

13. Rooney, Carol Marie

14. Rosengarten, Yonit

15. Ryan, Fay E.

16. Salomon, Stefanie A.

17. Saxe Doernberger & Vita, P.C.

18. United Glass Systems, Corp.

19. Zavell, Alec J.

Pursuant to 11th Cir. R. 26.1-3(b), Kaufman certifies that to the best of its knowledge there are no publicly traded companies or corporations that have an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Kaufman Lynn Construction, Inc. hereby requests that this Court conduct oral argument. Oral argument is necessary to resolve any questions the Court may have regarding the complex nature of the issues in this case, which are important issues of first impression impacting policyholders in the construction industry nationwide.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT .............................................. i

TABLE OF AUTHORITIES ............................................................................. iv

JURISDICTIONAL STATEMENT .................................................................... 1

ISSUES ON APPEAL ....................................................................................... 2

STATEMENT OF THE CASE ........................................................................... 2

    a.     Statement of Facts ................................................................................ 3

          i.     Kaufman's Contract with JM Family ....................................... 3

          ii.     The Insurance Program ............................................................ 5

               i.     The Policy ....................................................................... 5

               ii.     Underwriting of the Policy ............................................. 7

          iii.    Phase 1 is Completed ................................................................ 8

          iv.    The Completed Buildings Are Damaged During
               Tropical Storm Eta .................................................................... 9

          v.     The Claim ................................................................................ 10

    b.     Procedural History ............................................................................. 11

    c.     Standard of Review ........................................................................... 12

SUMMARY OF THE ARGUMENT ................................................................ 14

LEGAL ARGUMENT ..................................................................................... 17

    I.     The Course of Construction Exclusion Does Not Apply to
          Completed Buildings ......................................................................... 17

          a.     The Policy's Definition of "Completed" Applies to the
               COC Exclusion ................................................................................. 19

               i.     The Policy Defines Completed within the PCOH .......... 19

               ii.     The Extended PCOH Endorsement Amplifies the
                    Policy's Definition of Completed ................................. 21

b.    A Strict Interpretation Forecloses Application of the COC Exclusion ....................................................................23

c.    Liberty has the Burden to Demonstrate the Application of the Exclusion, and it has not – and cannot – do so ..............29

II.    Applying the COC Exclusion to the Loss Creates an Impermissible Coverage Gap ............................................................31

III.    Kaufman has Standing to Assert its Claim for Reformation of the Policy ........................................................................................33

i.    Kaufman suffered an "injury in fact" by paying premium to Liberty for an insurance policy that did not correctly capture the negotiated terms ....................................35

ii.    Liberty's change of the project description directly injured Kaufman ....................................................................36

iii.    Reformation would remedy Kaufman's injury .......................36

CONCLUSION ................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

Advanced Sys., Inc. v. Gotham Ins. Co.,
   272 So. 3d 523 (Fla. 3d DCA 2019) ................................................................25

Allison v. Vintage Sports Plaques,
   136 F.3d 1443 (11th Cir. 1998) .........................................................................12

Amerisure Mut. Ins. Co. v. Auchter Co.,
   673 F.3d 1294 (11th Cir. 2012) .........................................................................19

Assurance Co. of Am. v. Lucas Waterproofing Co., Inc.,
   581 F. Supp. 2d 1201 (S.D. Fla. 2008).............................................................20

Atwood v. St. Paul Fire & Marine Ins. Co.,
   363 Ill. App. 3d. (2006) ....................................................................................27

Auto-Owners Ins. Co. v. Anderson,
   756 So.2d 29 (Fla. 2000) ...........................................................................23, 24

Auto-Owners Ins. Co. v. Envtl. House Wrap, Inc.,
   3:17-CV-817-J-34PDB, 2019 WL 3069080 (M.D. Fla. July 12, 2019)..............19

Barcelona Hotel, LLC v. Nova Cas. Co.,
   57 So. 3d 228 (Fla. 3d DCA 2011) ...................................................................13

Buckner v. Fla. Habilitation Network, Inc.,
   489 F.3d 1151 (11th Cir. 2007) .........................................................................12

Castillo v. State Farm Florida Ins. Co.,
   971 So.2d 820 (Fla. 3d DCA 2007) ..................................................................25

City of S. Miami v. DeSantis,
   424 F. Supp. 3d 1309 (S.D. Fla. 2019)................................................. 16-17, 33

Colony Ins. Co. v. Corrosion Control, Inc.,
   187 F. App'x 918 (11th Cir. 2006) ....................................................................13

Cruz v. Publix Super Markets, Inc.,
   428 F.3d 1379 (11th Cir. 2005) .........................................................................12

Diaz v. Goat Express, LLC,
   3:20CV3986-TKW-HTC, 2021 WL 7541409 (N.D. Fla. Oct. 15, 2021) ...........26

Farrer v. U.S. Fid. & Guar. Co.,
 809 So. 2d 85 (Fla. 4th DCA 2002) ............................................................31, 32

Golden Door Jewelry Creations, Inc. v.
 Lloyds Underwriters Non-Marine Ass'n,
 8 F.3d 760 (11th Cir. 1993) ............................................................................33

Great Divide Ins. Co. v. Amerisure Ins. Co.,
 2:17-CV-14271, 2018 WL 1318340 (S.D. Fla. Mar. 14, 2018)........................19

Greenway Vill. S. Condo. Associations I, II, III & IV, Inc. v. Roach,
 397 So. 2d 954 (Fla. 4th DCA 1981) ...............................................................28

Houston Specialty Ins. Co. v. Vaughn,
 8:14-CV-1187-T-17JSS, 2017 WL 11474046 (M.D. Fla. Feb. 2, 2017) ...........27

Hunstein v. Preferred Collection & Mgmt. Servs., Inc.,
 48 F.4th 1236 (11th Cir. 2022) ..................................................................16, 33

James River Ins. Co. v. Fortress Sys., LLC,
 569 F. App'x 896 (11th Cir. 2014) ...................................................................13

LaFarge Corp. v. Travelers Indem. Co.,
 118 F.3d 1511 (11th Cir. 1997) .......................................................................31

Liberty Mutual Insurance Company v. Flitman,
 234 So.2d 390 (Fla. 3d DCA 1970) ..................................................................29

Morette Co. v. S.-Owners Ins. Co.,
 301 F. Supp. 3d 1175 (N.D. Fla. 2017)............................................................31

N. Am. Co. for Life & Health Ins. v. Caldwell,
 55 F.4th 867 (11th Cir. 2022) ..........................................................................25

Nat'l Fire Ins. Co. of Hartford v. Fortune Const. Co.,
 320 F.3d 1260 (11th Cir. 2003) .......................................................................12

Penzer v. Transp. Ins. Co.,
 29 So.3d 1000 (Fla. 2010) ...............................................................................13

S. Guar. Ins. Co. v. Zantop Intern. Airlines, Inc.,
 767 F.2d 795 (11th Cir. 1985) .........................................................................19

Sanchez Farms LLC v. S. Agcom Inc.,
 No. 1:14CV55-MW/GRJ, 2017 WL 5201795 (N.D. Fla. Jan. 11, 2017)............26

Shiloh Christian Ctr. v. Aspen Specialty Ins. Co.,
   65 F.4th 623 (11th Cir. 2023) ....................................................17, 19

Shy v. Ins. Co. of Pennsylvania,
   CV101415DSFMANX, 2011 WL 13213664 (C.D. Cal. Sept. 28, 2011) ...........27

Sparta Ins. Co. v. Colareta,
   990 F. Supp. 2d 1357 (S.D. Fla. 2014)..............................................20

Spokeo, Inc. v. Robins,
   578 U.S. 330, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016) as revised
   (May 24, 2016)........................................................................16, 33

State Farm Fire & Cas. Co. v. Steinberg,
   393 F.3d 1226 (11th Cir. 2004) ......................................................17

State Farm Mut. Auto Ins. Co. v. Spahn,
   8:12-CV-2619-T-23, 2013 WL 5532761 (M.D. Fla. Oct. 7, 2013) ...................31

Sunshine State Ins. Co. v. Jones,
   77 So. 3d 254 (Fla. 4th DCA 2012) ..................................................31

Swire Pac. Holdings, Inc. v. Zurich Ins. Co.,
   845 So.2d 161 (Fla. 2003) ....................................................24, 26, 31

Thompson v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.,
   249 F. Supp. 3d 606 (D. Conn. 2017) ................................................ 5

Towne Realty, Inc. v. Safeco Ins. Co.,
   854 F.2d 1264 (11th Cir. 1988) ......................................................12

U. S. Fid. & Guar. Co. v. Helms,
   413 So. 2d 767 (Fla. 3d DCA 1982) .............................................18, 29

U. S. Fire Ins. Co. v. Pruess,
   394 So. 2d 468 (Fla. 4th DCA 1981) .................................................25

U.S. Fire Ins. Co. v. J.S.U.B., Inc.,
   979 So. 2d 871 (Fla. 2007) ..........................................................17

Westmoreland v. Lumbermens Mut. Cas. Co.,
   704 So. 2d 176 (Fla. 4th DCA 1997) .........................................18, 23, 25

Westport Ins. Corp. v. VN Hotel Group, LLC,
   513 Fed. Appx. 927 (11th Cir. 2013) .........................................18, 23

<u>Witkin Design Grp., Inc. v. Travelers Prop. Cas. Co. of Am.</u>,
    No. 16-20484-CIV, 2016 WL 7670051 (S.D. Fla. Dec. 15, 2016), <u>report
    and recommendation adopted,</u> No. 16-20484-CIV, 2017 WL 105918
    (S.D. Fla. Jan. 10, 2017), <u>aff'd,</u> 712 F. App'x 894 (11th Cir. 2017)..................20

**Statutes & Other Authorities:**

28 U.S.C. § 1291.................................................................................. 1

28 U.S.C. § 1332.................................................................................. 1

28 U.S.C. § 2201.................................................................................. 1

Fed. R. Civ. P. 56(c) ..........................................................................13

Fla. Stat. § 95.11(3) ...........................................................................15

Fla. Stat. § 95.11(3)(b).................................................................6, 21

Fla. Stat. § 588.002(4).......................................................................25

2 BRUNER & O'CONNOR CONSTRUCTION LAW § 5:199.........................25

48A Fla. Jur 2d Statutes § 152 ..........................................................22

Causes of Action Based on Improvements to Real Property, 360 FL
    Senate (2023) ...............................................................................22

*Completed Operations*, IRMI, https://www.irmi.com/term/insurance-
    definitions/completed-operations ................................................. 5

*Ongoing Operations*, IRMI, https://www.irmi.com/term/insurance-
    definitions/ongoing-operations ..................................................... 5

Justin Sweet and Jonathan Sweet, 2 SWEET ON CONSTRUCTION INDUSTRY
    CONTRACTS, MAJOR AIA DOCUMENTS § 15.18 (3d 1996)..................25

Richard H. Lowe & Elise H. Walthall, <u>When Architects Withhold
    Certificates of Substantial Completion, and Other Problems,</u>
    CONSTRUCTION LAW (October 1999) ................................................25

# JURISDICTIONAL STATEMENT

The United States District Court for the Southern District of Florida ("District Court") has jurisdiction over the action from which this appeal is taken pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs, and pursuant to 28 U.S.C. § 2201.

Appellant Kaufman Lynn Construction, Inc. ("Kaufman") timely appealed the District Court's entry of Final Judgment dated August 10, 2023,[1] granting Plaintiff-Appellee Liberty Surplus Insurance Corporation's ("Liberty") January 27, 2023 Motion for Summary Judgment on its claim for Declaratory Relief;[2] denying as moot Kaufman's Motion for Summary Judgment on its Counterclaim for Breach of Contract;[3] denying Kaufman's Motion for Summary Judgment on its Counterclaim for Reformation;[4] and dismissing Kaufman's Counterclaim for Reformation without prejudice.

This Court has jurisdiction over the present appeal pursuant to 28 U.S.C § 1291.

---

[1] Doc 214.
[2] Doc 161.
[3] Doc 144.
[4] Id.

<u>**ISSUES ON APPEAL**</u>

1. **Whether the District Court erred when it interpreted a construction-industry specific Course of Construction Exclusion to preclude coverage for damage to completed buildings.**

2. **Whether the District Court erred by concluding, as a matter of law, that the Course of Construction Exclusion relieved Liberty of its duty to defend and indemnify Kaufman and United Glass Systems, Corp. ("UGS") for the subject loss.**

3. **Whether the District Court erred by concluding that Kaufman did not have standing to bring its counterclaim for Reformation.**

<u>**STATEMENT OF THE CASE**</u>

This appeal arises out of the application of a Course of Construction Exclusion to preclude coverage for damage to completed buildings.

Kaufman contracted with JM Family Enterprises, Inc. ("JM Family") to act as the general contractor on an approximately $150 million-dollar project at JM Family's corporate headquarters.[5] In exchange for a substantial premium, Liberty issued a Contractor Controlled Insurance Policy ("CCIP") to Kaufman to provide general liability coverage for the project,[6] which would proceed in two phases of

---

[5] See generally, Doc 148-9, (the "Kaufman/JM Contract").
[6] See generally, Doc 96-1.

construction.[7] In November 2020, a combination of Tropical Storm Eta and defective glazed aluminum curtainwalls and window walls installed by Kaufman's subcontractor caused significant, covered property damage – totaling in excess of $3.2 million.[8]

It is undisputed that the damaged buildings were complete by every measure prior to the loss. Nevertheless, Liberty weaponized the Course of Construction Exclusion – an exclusion applying to work under construction – to deny coverage.[9] The District Court ratified Liberty's actions, and this appeal follows.[10] In addition, the District Court dismissed a viable cause of action for reformation due to lack of standing,[11] where Kaufman has standing and is entitled to resolution on the merits.

### a. Statement of Facts

### i.  Kaufman's Contract with JM Family

Kaufman was hired by JM Family to be the general contractor for the JM Family Corporate Campus in Deerfield Beach, Florida ("Corporate Campus").[12] The project was an extensive renovation and expansion of JM Family's existing

---

[7] Doc 148-11, pg 2; Doc 148-9, pg 9 ("The Work required hereby is expected to be performed in at least two (2) phases (each phase being a 'Phase'), as set forth herein.").
[8] Doc 148-24; Doc 148-25, pg 3.
[9] Doc 148-34.
[10] Doc 192.
[11] Doc 213.
[12] See, Doc 148-9.

headquarters, transforming it into a pedestrian campus with state-of-the art facilities.[13] Kaufman, in turn, hired Defendant, United Glass Systems, Corp. ("UGS"), to provide a full, functional window wall system, including, *inter alia*, glazed aluminum curtainwalls and window walls.[14]

The Kaufman/JM Contract required the work be sequenced in two distinct phases:[15]

> Phase 1: 2x2 x 4-story steel and concrete office buildings (57k sq ft), a 2-story dining hall (27k sq ft), central energy plant (power, chillers, cooling tower, fire pump, emergency generator) (6k sq ft), 6-story precast parking garage (5 levels of parking, roof lid with solar panels) (306k sq ft)
>
> Phase 2: Demolish 5 existing buildings, 4-story steel and concrete office building (28k sq ft), 2-story training and conference center (35k sq ft), sports and recreation building (gym, basketball court, locker rooms, showers) (25k sq ft), amphitheater structure, hardscaping, landscaping, water features (fountains, reflecting pools).

The phased sequencing was a material element of the Kaufman/JM Contract because JM Family needed to relocate its employees and business operations from existing buildings (described in "Phase 2") to the newly constructed buildings (which would be built during "Phase 1").[16] After Phase 1 buildings were complete and operating

---

[13] Id.

[14] Doc 148-3.

[15] Doc 148-9; Doc 148-11, pg 2.

[16] Doc 148-1, pg 23. Unless noted otherwise, all citations to deposition transcripts refer to the page numbers assigned by the court reporter.

as JM Family headquarters, Phase 2 – which included demolition of the old headquarters and construction of the balance of new buildings – would begin.[17]

## ii. The Insurance Program

### i. The Policy

To insure the work, Liberty issued a commercial general liability policy to Kaufman (the "Policy")[18] through a Contractor Controlled Insurance Program ("CCIP").[19] The Policy covered both ongoing operations (work in the course of construction)[20] and completed operations (work that had been finished and put to use).[21] The Policy had a dedicated aggregate limit of $4,000,000 for completed operations via the products-completed operations hazard ("PCOH").[22] The PCOH provides that work:

> will be deemed **completed** . . . When **that part of the work** done at a job site **has been put to its intended use** by any person or organization

---

[17] Id.; see also, Doc 148-9.

[18] Doc 96-1. The policy period was September 10, 2018 to December 31, 2021 with a limit of $2,000,000 per occurrence and $4,000,000 aggregate. See also, Doc 148-5, pg 3.

[19] CCIPs "are centralized, project-specific insurance policies sponsored and overseen by the general contractor for the project." See, e.g., Thompson v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA., 249 F. Supp. 3d 606, 609 (D. Conn. 2017). Instead of each contractor – including subcontractors – providing their own liability insurance, the CCIP is available to all.

[20] https://www.irmi.com/term/insurance-definitions/ongoing-operations (last visted November 1, 2023).

[21] https://www.irmi.com/term/insurance-definitions/completed-operations (last visited November 1, 2023).

[22] Doc 96-1, pg 3.

other than another contractor or subcontractor working on the same project.[23]

(emphasis added). The PCOH and three additional Policy provisions are relevant here. First, the Extended Products-Completed Operations Endorsement ("Extended PCOH Endorsement") reinforces the coverage period for PCOH claims and incorporates the statute of repose (which is also governed by completion):

> [t]his Extension Period will begin on the date 'your work' is deemed completed as defined by the applicable statue of repose provided by the controlling law of the jurisdiction where the project is located… This Extension Period shall end when the period of time allowed by the applicable statute of repose of the controlling jurisdiction expires.[24]

The incorporation of the statute of repose means the Policy expressly triggers coverage for PCOH claims upon the issuance of a Temporary Certificate of Occupancy ("TCO") pursuant to Florida law.[25]

Second, the Policy contains an Exclusion – the "Damage to the Project During the Course of Construction Exclusion" ("COC Exclusion")[26] – intended to preclude coverage for losses that occur to work that is ongoing. Specifically, the Policy does not apply to "[a]ny 'property damage' at or to any project insured under this policy during the course of construction until the project is completed."[27]

---

[23] Doc 96-1, pg 27 (emphasis added).
[24] Doc 96-1, pg 68.
[25] Fla. Stat. § 95.11(3)(b).
[26] Doc 96-1, pg 45.
[27] Id.

Finally, "Limitation of Coverage to Designated Premises or Project" ("Designated Project Endorsement"), includes a description of the premises to be insured by the Policy as follows:

> Demolition of (5) five existing buildings and New, Ground-Up Construction of (2) two (4) four-story steel SE concrete office buildings, (1) one (2) two-story dining hall, a 6k square foot, central energy plant, and a (6) six-story precast parking garage, as well as any operations within 1,000 feet of the designated project that are necessary and incidental thereto.[28]

## ii.  Underwriting of the Policy

In deciding to insure risks for the project, Liberty engaged in a thorough underwriting investigation.[29] Among many things, Kaufman submitted voluminous documentation to Liberty at its request,[30] including Kaufman's Application for Insurance ("Application"),[31] the Master Site Plan for the Corporate Campus (plainly delineating the phases),[32] and the Kaufman/JM Contract,[33] (collectively the "CCIP Submission").

---

[28] Doc 96-1, pg 62.
[29] See Doc 148-6; Doc 148-5.
[30] Doc 148-5; Doc 148-6.
[31] Doc 148-11.
[32] Doc 148-8; Doc 148-7, pg 47.
[33] Doc 148-9.

Liberty agreed to insure the project and bound the insurance (a precursor to issuing the actual insurance policy, though no less legally binding) so work could commence.[34]

When Liberty eventually produced the final Policy document, it included, for the first time, the Designated Project Endorsement,[35] Which contained a project description materially different from the CCIP Submission because it removed the phased sequence of construction, and omitted several structures and project components altogether.[36] This drafting error was explained by the Policy's inexperienced underwriter,[37] Danielle Stewart, who testified that that she did not understand – and thus failed to appreciate – the significance of the phases to the work or the Policy (specifically, that demolition would occur *after* construction of Phase 1),[38] and admitted she unilaterally drafted a different project description because of her confusion.[39]

### iii.  Phase 1 is Completed.

---

[34] <u>See</u> Doc 148-6.
[35] Doc 148-6; Doc 96-1, pg 62.
[36] <u>See</u> Doc 148-11; Doc 148-9; Doc 96-1, pg 62.
[37] Doc. 148-7 pg 40; Doc 148-6; Doc 96-1, pg 62; Doc 148-11.
[38] Doc 148-7, pg 45-46.
[39] Doc 148-7, pg 40; pg 52-53.

The City of Deerfield Beach issued Temporary Certificates of Occupancy ("TCO") for the Phase 1 buildings[40] on July 10, 2020.[41] Thereafter, JM Family had exclusive possession, with full operational control, dedicated security protocols and staff, and all infrastructure necessary to conduct operations.[42] As planned, JM Family relocated its employees from its existing facilities (that would be demolished in Phase 2) and was actively using the completed Phase 1 buildings as its fully operational corporate headquarters.[43]

On October 9, 2020, Final Certificates of Occupancy ("CO") were issued.[44] Having received TCO and CO, and with JM Family occupying the buildings, each of the Phase 1 buildings were complete by every possible metric.

### iv. The Completed Buildings Are Damaged During Tropical Storm Eta

In November 2020, Tropical Storm Eta struck Deerfield Beach, Florida. The storm, coupled with defective work performed by UGS, resulted in significant water

---

[40] These buildings, along with the Parking Garage and the Central Energy Plant, comprise the "Phase 1 Buildings." A Final Certificate of Occupancy for the Parking Garage was issued months earlier, on March 12, 2020; Doc 148-16; the central energy plant was completed prior to completion of the rest of Phase 1. Because the central energy plant was not an occupied building, it did not receive a Certificate of Occupancy; Doc 148-1, pgs 222-224.

[41] Doc 148-17; Doc. 148-2 pg 14, pg 32; Doc 148-1, pg 155.

[42] See Doc 148-19.

[43] Id.; Doc 148-1, pg 23.

[44] Doc 148-1, pg 222-224; Doc 148-20; Doc 148-21; Doc 148-22.

intrusion into the Phase 1 completed buildings.[45] The resultant repair costs were $3,337,372.39 (the "Loss").[46]

JM Family immediately identified Kaufman's culpability for the damages, and repeatedly demanded, both orally and in writing, that Kaufman immediately pay for and repair the extensive damage ("Claim") pursuant to Kaufman's contractual obligations.[47]

Kaufman eventually sued UGS, also insured by the Policy, for the damages arising out of its defective work, which is currently pending in the Fifteenth Judicial Circuit, in Palm Beach County, Florida.[48]

## v.  The Claim

On November 16, 2020, Kaufman put Liberty on notice of the Claim and tendered its demand for coverage under the Policy. On November 20, 2020, Liberty acknowledged the Claim and commenced its adjustment, which included, *inter alia*, retention of defense counsel on Kaufman's behalf (who analyzed and confirmed Kaufman's liability *and* the quantum of damages),[49] and numerous document requests - specifically, Certificates of Occupancy (CO). Liberty's adjuster testified

---

[45] Doc 148-33, pg 2.
[46] Doc 148-24; Doc 148-25, pg 3.
[47] Doc 148-1, pg 155; Doc 148-4, pg 29.
[48] <u>Kaufman Lynn Construction, Inc. v. United Glass Systems, Corp. et al.</u>, Case No. 2021-CA-3035, Circuit Court, Fifteenth Judicial Circuit, Palm Beach County, Florida ("Underlying Action").
[49] <u>See</u>, Doc 148-35, pg 5.

that she requested COs to confirm that the damaged buildings were complete prior to the Loss – in acknowledging receipt of the COs, Liberty confirmed that the damaged buildings were complete at the time of the Loss.[50]

On August 30, 2021, *nearly a year into its adjustment of the Claim*, Liberty first asserted that the COC Exclusion applied to the Phase 1 damage because Phase 2 was not complete.[51]

**b. Procedural History**

After denying the Claim, Liberty sued UGS and Kaufman on February 8, 2022, in the District Court seeking a Declaratory Judgment that the COC Exclusion relieved it of its defense and indemnity obligations to UGS. To date, UGS, who appears insolvent, has participated minimally in the defense of this lawsuit.

Kaufman asserted counterclaims for Declaratory Judgment,[52] Breach of Contract, and Reformation.

On January 13, 2023, Kaufman filed a motion for summary judgment on its counterclaims for Breach of Contract and Reformation;[53] and on January 27, 2023,

---

[50] See Doc 148-3, pgs 36-37 (adjuster acknowledges receipt of CO and confirms appropriateness of notice to the property carrier in light of completion).
[51] Doc 148-34, pg 2.
[52] On October 26, 2022, the District Court dismissed Kaufman's counterclaim for Declaratory Judgment. Doc 110.
[53] Doc 144.

Liberty filed motions for summary judgment on its claim for Declaratory Judgment[54] and Kaufman's counterclaim for Breach of Contract.[55]

On February 27, 2023, the District Court issued an Omnibus Order:[56] (1) granting Liberty's motion for summary judgment on its claim against UGS for Declaratory Relief; (2) denying Liberty's motion for summary judgment on Kaufman's counterclaim for Breach of Contract; (3) denying Kaufman's motion for summary judgment on its counterclaim for Breach of Contract; and (4) reserving ruling on Kaufman's motion as to its counterclaim for Reformation until additional briefing on standing and ripeness was submitted.

On June 20, 2023, Kaufman filed a Motion for Reconsideration of the Omnibus Order.[57] On August 10, 2023, the District Court issued a Second Omnibus Order[58] (collectively "Omnibus Orders") accompanied by Final Judgment,[59] which, *inter alia*, denied Kaufman's motion for summary judgment on its counterclaim for Reformation, *sua sponte* dismissed the counterclaim for Reformation without prejudice, and summarily denied Kaufman's Motion for Reconsideration.

### c. Standard of Review

---

[54] Doc 161.

[55] Doc 162.

[56] Doc 192.

[57] Doc 209.

[58] Doc 213.

[59] Id.

The standard of review on appeal of the Omnibus Orders is *de novo*.[60] "A federal court sitting in diversity must apply state substantive law."[61] Thus, "[Courts of Appeals] are bound to decide the case the way it appears the state's highest court would."[62] The Court of Appeals applies the same legal standards that bound the District Court.[63]

"[A] question of insurance policy interpretation, which is a question of law, [is also] subject to de novo review."[64] Additionally, the meaning of an insurance policy is a question of law, and when reviewing a question of law the Court of Appeals has an obligation to reach its own conclusions independently of the determination made by the lower court.[65] The Court of Appeals must reverse the District Court's decision unless it finds "that . . . the moving party [was] entitled to a judgment as a matter of law."[66] In reversing summary judgment, the Court of

---

[60] Buckner v. Fla. Habilitation Network, Inc., 489 F.3d 1151, 1154 (11th Cir. 2007); Cruz v. Publix Super Markets, Inc., 428 F.3d 1379, 1382 (11th Cir. 2005).

[61] Allison v. Vintage Sports Plaques, 136 F.3d 1443, 1445 (11th Cir.1998).

[62] Towne Realty, Inc. v. Safeco Ins. Co., 854 F.2d 1264, 1269 n. 5 (11th Cir.1988).

[63] Nat'l Fire Ins. Co. of Hartford v. Fortune Const. Co., 320 F.3d 1260, 1267 (11th Cir. 2003).

[64] Penzer v. Transp. Ins. Co., 29 So.3d 1000, 1005 (Fla.2010).

[65] James River Ins. Co. v. Fortress Sys., LLC, 569 F. App'x 896, 900 (11th Cir. 2014).

[66] Colony Ins. Co. v. Corrosion Control, Inc., 187 F. App'x 918, 920 (11th Cir. 2006); Fed. R. Civ. P. 56(c).

Appeals may declare that an insurer owes coverage pursuant to the terms of the policy.[67]

As demonstrated at length herein, the Omnibus Orders must be reversed – Liberty was not entitled to judgment *as a matter of law*, and the District Court's findings contained in the Omnibus Orders flagrantly violate black letter Florida law and the express language of the subject Policy.

Accordingly, this Court should reverse the Omnibus Orders and enter an Order: (1) concluding, as a matter of law, that the COC Exclusion does not apply to the Loss; (2) declaring that Liberty must defend and indemnify UGS in the Underlying Action; and (3) remanding Kaufman's Breach of Contract Claim to the District Court.

## Summary of the Argument

This appeal – a matter of first impression - turns on whether an insurer may escape its contractual obligations by applying a "Course of Construction" Exclusion to buildings that are complete and not in the course of construction. This position, espoused by Liberty and endorsed by the District Court, violates the plain language of the subject Policy and black-letter Florida law, ignores well-settled industry standards, and is patently illogical.

---

[67] Barcelona Hotel, LLC v. Nova Cas. Co., 57 So. 3d 228, 230–32 (Fla. 3d DCA 2011).

The answer is as straightforward as the question: "in the course of construction" means what it says and cannot apply after work is done. Absent the reversal of the Omnibus Orders, policyholders nationwide are at risk that the insurance coverage purchased for *completed operations* could be eviscerated by a manifestly erroneous interpretation of a Course of Construction Exclusion.

In interpreting insurance contracts, Courts are required to construe the entire policy as a whole, providing each term with its full meaning and effect. Here, the Policy defines the term "completed" and dictates that the COC Exclusion does not apply when work, *or even a portion thereof*, is put to its intended use. The facts are not in dispute: the subject buildings were complete – by all benchmarks - prior to sustaining property damage expressly covered by the Policy.

Moreover, the COC Exclusion is not immune from the rules that apply to all exclusions – the law requires that it be construed narrowly, with any ambiguity resolved in favor of coverage. That narrow interpretation precludes the application of the COC Exclusion to this Loss - *each material term* contained therein is ambiguous and susceptible to more than one reasonable meaning. First, the COC Exclusion does not define "course of construction." The plain meaning of this phrase – along with its industry-specific context – demonstrates that the exclusion can only be applied to damage sustained to work *that is being constructed.*

Second, the term "completed", even absent the Policy's definition, must be construed narrowly and in accordance with the specific risks the Policy was designed to insure against. Florida law makes clear that context matters – a crucial component of this construction-specific context is recognizing that "completion" carries a specific and widely recognized meaning in the industry. Aligning with the Policy's definition of "completed," the industry specific meaning deems work "completed" when the work has been put to its intended use, customarily evidenced by a certificate of occupancy. *That industry specific expectation is so engrained and axiomatic that it is now expressly codified by Florida statute.* Because both the Policy definition and the industry specific meaning of "completed" are reasonable interpretations of the term, the Court is required to – at a minimum - find an ambiguity and construe the language in favor of coverage.

Finally, the word "project" is ambiguous. First, Liberty defines the term project by its own terms – "project." This, alone, renders the language ambiguous as a matter of law. In addition, a strict construction of the term "project" pursuant to the language in the COC Exclusion allows for a reasonable interpretation that the project is deemed completed when each individual building or structure is completed – which, once again, requires a finding of coverage.

Thus, the plain language of the Policy, coupled with black-letter Florida law, requires a determination that the COC Exclusion simply cannot apply to the Loss.

Accordingly, this Court should reverse the Omnibus Orders and conclude that the COC Exclusion does not alleviate Liberty of its obligations to Kaufman or UGS in the Underlying Action.

Finally, Kaufman is entitled to Reformation of the subject Policy. Kaufman has demonstrated a mutual mistake between the parties and that it has standing to bring such a claim. Indeed, Kaufman has demonstrated standing to assert its claim for Reformation against Liberty by satisfying the three requirements for standing: injury in fact, causation, and redressability.[68] Specifically, Kaufman has sustained a (1) significant financial injury (2) as a direct result of Liberty's unilateral alteration of the Policy language, and (3) reformation will rectify this injury to Kaufman. Accordingly, Kaufman respectfully requests that this Court reverse the Omnibus Orders and conclude that it has standing to seek reformation of the Policy.

## Legal Argument

### I. The Course of Construction Exclusion Does Not Apply to Completed Buildings.

Florida law does not permit a Course of Construction Exclusion ("COC Exclusion") to preclude coverage for a loss sustained to completed buildings – buildings that were indisputably *not in the course of construction* at the time of the

---

[68] Spokeo, Inc. v. Robins, 578 U.S. 330, 338, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016), as revised (May 24, 2016); Hunstein v. Preferred Collection & Mgmt. Servs., Inc., 48 F.4th 1236, 1242 (11th Cir. 2022); City of S. Miami v. DeSantis, 424 F. Supp. 3d 1309, 1320 (S.D. Fla. 2019).

Loss.  It is axiomatic that insurance policies be interpreted in accordance with the "plain language of the policy, as bargained for by the parties."[69] In particular, "'[i]n insurance coverage cases under Florida law, courts look at the insurance policy as a whole and give every provision its full meaning and operative effect.'"[70] "When construing a policy's terms, the pertinent provisions should be read *in pari materia.*"[71]

Insurance policies have two basic elements: provisions that grant coverage, and provisions that limit it. "When dealing with grants of coverage, the courts should interpret the policy language broadly in favor of the existence of insurance, while limitations or exclusions should be interpreted narrowly against the insurer."[72] "[E]xclusionary clauses in liability insurance policies are always strictly construed."[73] The burden to prove the applicability of an exclusion rests with the insurer.[74]

[69] Shiloh Christian Ctr. v. Aspen Specialty Ins. Co., 65 F.4th 623, 627 (11th Cir. 2023).

[70] Id. (quoting State Farm Fire & Cas. Co. v. Steinberg, 393 F.3d 1226, 1230 (11th Cir. 2004)).

[71] U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 877 (Fla. 2007).

[72] Westport Ins. Corp. v. VN Hotel Group, LLC, 513 Fed. Appx. 927, 932 (11th Cir. 2013).

[73] Westmoreland v. Lumbermens Mut. Cas. Co., 704 So. 2d 176, 179 (Fla. 4th DCA 1997).

[74] U. S. Fid. & Guar. Co. v. Helms, 413 So. 2d 767, 768 (Fla. 3d DCA 1982).

Here, the COC Exclusion precludes coverage for "[a]ny 'property damage' at or to any project insured under this policy during the course of construction until the project is completed."[75] The COC Exclusion cannot be applied to preclude coverage for this Loss because: (1) the Policy defines "completed", and the damaged buildings were complete – i.e. *not in the course of construction* – pursuant to the Policy's own definition; (2) exclusions to coverage must be construed narrowly, and a narrow interpretation of the COC Exclusion prohibits its application; and (3) enforcement of the COC Exclusion creates an impermissible gap in coverage.

### a. The Policy's Definition of "Completed" Applies to the COC Exclusion.

Pursuant to Florida law's "cardinal principal"[76] that insurance policies be interpreted in accordance with their plain language, the definition of "completed" explicitly provided by the Policy must be used when interpreting the COC Exclusion. Specifically, the Policy defines the term "completed" *in the definitions section of the Policy*,[77] and further refines that definition within the Extended PCOH Endorsement.[78] It is undisputed that the damaged buildings were completed as defined by both the PCOH and the Extended PCOH Endorsement, triggering

---

[75] Doc 96-1, pg 45.

[76] Shiloh Christian Ctr. v. Aspen Specialty Ins. Co., 65 F.4th 623, 627 (11th Cir. 2023)

[77] Doc 96-1, pg 27.

[78] Id. at 68.

coverage as a completed operations Loss, and precluding application of the COC

Exclusion.

### i. The Policy Defines Completed within the PCOH.

The PCOH is the Policy's mechanism to define and distinguish ongoing and

completed operations.[79] This distinction is temporal, turning on when property

damage occurs in relation to when work is completed.[80] Completion of work drives

the analysis of whether a claim falls within ongoing or completed operations

coverage, and the PCOH governs that determination by defining "complete."

First, within the PCOH definition, the term "completed" is defined as follows:

> 'your work'[81] will be deemed completed . . . When **that part of the work** done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.[82]

---

[79] See Amerisure Mut. Ins. Co. v. Auchter Co., 673 F.3d 1294, 1299 (11th Cir. 2012).

[80] See Auto-Owners Ins. Co. v. Envtl. House Wrap, Inc., 3:17-CV-817-J-34PDB, 2019 WL 3069080, at *6 (M.D. Fla. July 12, 2019); S. Guar. Ins. Co. v. Zantop Intern. Airlines, Inc., 767 F.2d 795, 799 (11th Cir. 1985) (noting completed operations coverage "is distinct from 'premises-operations' coverage, which insures against damage arising from the ongoing activities of the operation of a particular business."); Great Divide Ins. Co. v. Amerisure Ins. Co., 2:17-CV-14271, 2018 WL 1318340, at *3 (S.D. Fla. Mar. 14, 2018).

[81] As the general contractor, the scope of "[Kaufman's] work" is the whole project. See Assurance Co. of Am. v. Lucas Waterproofing Co., Inc., 581 F. Supp. 2d 1201, 1211 (S.D. Fla. 2008).

[82] Doc 96-1, pg 27.

(emphasis added). Florida Courts have expressly recognized that the PCOH is a *definition* applicable to the entire Policy. In Sparta Ins. Co. v. Colareta, 990 F. Supp. 2d 1357, 1365 (S.D. Fla. 2014), the Court held:

> '[P]roducts-completed operations hazard' is listed only in the 'Definitions' section of the policy and is not designated as a type of coverage. As a result, any claim falling under the definition of 'products-completed operations hazard' is subject to the terms and limitations of the coverage portion to which it applies. Because 'products-completed operations hazard' is defined as applying to bodily injury and property damage, it necessarily falls under Coverage A.[83]

Thus, the PCOH definition, which dictates when work is "completed," must apply to the COC Exclusion. All parties agree that the Phase 1 buildings met this definition; this should have been the end of the District Court's analysis, holding in favor of coverage.

### ii. The Extended PCOH Endorsement Amplifies the Policy's Definition of Completed.

The Policy's singular definition of "completed" is further reinforced in the Extended PCOH Endorsement. Specifically, the Extended PCOH Endorsement provides that coverage for PCOH claims *begins on* "the date 'your work' is deemed completed ***as defined by the applicable statue of repose*** provided by the controlling

---

[83] Sparta Ins. Co. v. Colareta, 990 F. Supp. 2d 1357, 1365 (S.D. Fla. 2014); Witkin Design Grp., Inc. v. Travelers Prop. Cas. Co. of Am., No. 16-20484-CIV, 2016 WL 7670051, at *9 (S.D. Fla. Dec. 15, 2016), report and recommendation adopted, No. 16-20484-CIV, 2017 WL 105918 (S.D. Fla. Jan. 10, 2017), aff'd, 712 F. App'x 894 (11th Cir. 2017).

law of the jurisdiction where the project is located,"[84] continuing through to the end of the repose period.[85]

This reference incorporates Florida's statute of repose into the Policy, which provides, in pertinent part:

> […] if the improvement to real property consists of the design, planning, or construction of multiple buildings, *each* building must be considered its own improvement for purposes of determining the limitations period set forth in this paragraph.[86]

(emphasis added). The statute of repose therefore provides that issuance of a TCO denotes completion, triggering the repose period.[87] By using TCO as the benchmark for completion, the statute – and by incorporation, the Policy – provides a concrete signifier for work completion.

Significantly, Florida's legislature has been overt that the statute analyzes completion on a building-by-building basis in multi-building projects, like the one at issue here, confirming that the latest statutory amendment:

---

[84] Doc 96-1, pg 68 (emphasis added).
[85] Id.
[86] Fla. Stat. § 95.11(3)(b).
[87] Id. ("[W]ith the time running from the date the authority having jurisdiction issues a **temporary certificate of occupancy**, a certificate of occupancy, or a certificate of completion, or the date of abandonment of construction if not completed, whichever date is earliest.") (emphasis added).

[r]evises language in the bill to clarify[88] that if a project has multiple buildings, each individual building . . . must be considered its own improvement for purposes of determining the limitations period. . .[89]

The Extended PCOH Endorsement must be interpreted and applied accordingly. As set forth above, the damaged buildings received *both* TCO and CO before the loss.[90] Upon the issuance of same for *each building*, the statute of repose was triggered for *each building*, simultaneously triggering the coverage for PCOH claims for *each building* – and rendering inert the COC Exclusion as to *those buildings*.

The PCOH is the first domino in the chain – when work is put to its intended use and thus complete, all other elements of the policy fall in line. Liberty's position that the PCOH can be triggered – but that the COC Exclusion could *still* preclude coverage, is wholly illogical and eviscerates the PCOH.

*** 

---

[88] 48A Fla. Jur 2d Statutes § 152 ("where [a] statute is being clarified, a later amendment may be looked upon as stating what was the original legislative intent. Thus, subsequent amendments to a statute that serve to clarify rather than change the existing law are entitled to substantial weight in construing the earlier law.").

[89] Analyses by The Professional Staff of the Committee on Judiciary dated February 21, 2023, and The Professional Staff of the Committee on Rules dated March 7, 2023 https://www.flsenate.gov/Session/Bill/2023/360/?Tab=Analyses (both analyses state the changes to the statute "Revis[e] language in the bill to clarify that if a project has multiple buildings, each individual building. . . . must be considered its own improvement for purposes of determining the limitations period in the bill.").

[90] Doc 148-17; Doc 148-19; Doc 148-21; Doc 148-22.

In sum, Florida law requires that the entire Policy be interpreted as a whole, giving each provision its full meaning and effect.[91] The District Court made a critical error by affirmatively refusing to interpret the Policy as a whole, failing to apply the definitions of "complete" contained therein, and instead interpreting the COC Exclusion in a vacuum with only the benefit of Merriam-Webster's online dictionary.[92] In so doing, the District Court violated a basic tenet of insurance policy interpretation, requiring the reversal of the Omnibus Orders and a declaration that the COC Exclusion does not apply to the Loss.

### b. A Strict Interpretation Forecloses Application of the COC Exclusion.

As set forth above, limitations or exclusions to coverage must be "interpreted narrowly against the insurer"[93] and "[e]xclusionary clauses in liability insurance policies are always strictly construed."[94] Further, "[i]f the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and another limiting coverage, the insurance policy is considered ambiguous."[95]

---

[91] Auto–Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla. 2000).

[92] Doc 192, pg 14.

[93] Westport Ins. Corp. v. VN Hotel Group, LLC, 513 Fed. Appx. 927, 932 (11th Cir. 2013).

[94] Westmoreland v. Lumbermens Mut. Cas. Co., 704 So. 2d 176, 179 (Fla. 4th DCA 1997).

[95] Auto-Owners Ins. Co., 756 So.2d 29 at 34.

"Ambiguities in insurance contracts are interpreted against the insurer and in favor of the insured."[96]

The COC Exclusion must be interpreted in this context. The COC Exclusion provides:

> This insurance does not apply to: … Any 'property damage' at or to any project insured under this policy during the course of construction until the project is completed.[97]

Critical to the application of the COC Exclusion is the undefined phrase "course of construction." An appropriate reading of the COC Exclusion, giving the phrase "during the course of construction" the required full meaning and operative effect, demonstrates that the COC Exclusion can only apply when <u>incomplete work</u> is damaged *during the course of construction*, i.e., damage to work that is actively under construction. As the damaged Phase 1 buildings were indisputably complete – i.e., *not under construction* – the COC Exclusion cannot apply by its plain terms.

As discussed above, the Policy provides a definition of "completed" that must be considered in interpreting this exclusion; however, even in the absence of a policy-provided definition, Florida law demands that the term "completed" be

---

[96] <u>Swire Pac. Holdings, Inc. v. Zurich Ins. Co.</u>, 845 So.2d 161, 165 (Fla.2003).
[97] Doc 96-1, pg 45.

interpreted in a manner that is consistent with the Policy's context and the risks it is designed to insure against.[98]

The Policy was purposefully placed to provide construction-specific coverage to Kaufman and its subcontractors for work to be performed at the Corporate Campus.[99] This context is critical in interpreting the Policy's terms and provisions.[100] A crucial component of this construction-specific context is recognizing that "completion" carries a specific and widely recognized meaning in the industry.[101] Aligning with the Policy's definition of "completed", the industry

---

[98] Westmoreland v. Lumbermens Mut. Cas. Co., 704 So. 2d 176, 180 (Fla. 4th DCA 1997); see also Advanced Sys., Inc. v. Gotham Ins. Co., 272 So. 3d 523, 527 (Fla. 3d DCA 2019) (citing Castillo v. State Farm Florida Ins. Co., 971 So.2d 820, 824 (Fla. 3d DCA 2007)).

[99] See Doc 96-1; see also Doc 148-5; Doc 148-6.

[100] N. Am. Co. for Life & Health Ins. v. Caldwell, 55 F.4th 867, 869 (11th Cir. 2022) (("Under Florida law, the 'terms of an insurance policy must be construed to promote a reasonable, practical and sensible interpretation consistent with the intent of the parties.'" (quoting, U. S. Fire Ins. Co. v. Pruess, 394 So. 2d 468, 470 (Fla. 4th DCA 1981)).

[101] See Fla. Stat. 588.002(4) ("'Completion of a building or improvement' means issuance of a certificate of occupancy, whether temporary or otherwise. . .".."); see also 2 Bruner & O'Connor Construction Law § 5:199; Richard H. Lowe & Elise H. Walthall, When Architects Withhold Certificates of Substantial Completion, and Other Problems, Construction Law, OCTOBER 1999, at 5 ("'Substantial completion' is a term of art used in the construction industry.") (citing Justin Sweet and Jonathan Sweet, 2 SWEET ON CONSTRUCTION INDUSTRY CONTRACTS, MAJOR AIA DOCUMENTS § 15.18 (3d 1996)).

specific meaning deems work "completed" when a certificate of occupancy is issued, and when the work has been put to its intended use.[102]

Here, the District Court erred when it patently ignored the plain language of the Policy and the context in which the Policy was issued in favor of "the plain and ordinary meaning of complete"[103] as defined in the Merriam-Webster Dictionary. A strict and narrow construction of "completed" pursuant to Florida law does not permit the use of a dictionary definition to assign meaning to that term *in a vacuum.* The District Court was required to determine whether other reasonable interpretations of the exclusionary language existed (which they do, both by the Policy's very terms and the industry-specific context presented by Kaufman), conclude that the language was ambiguous, and interpret the Policy in favor of coverage (*whether or not* it agreed with the alternate reasonable interpretations).

Finally, the term "project" in the COC Exclusion is required to be construed narrowly, and a narrow construction cannot support the application of the COC Exclusion. The COC Exclusion states that "[s]olely for the purpose of this endorsement . . . Project includes, but is not limited to, buildings or structures and

---

[102] Swire Pacific Holdings, Inc. v. Zurich Insurance Company, 845 So.2d 161, 165 (Fla. 2003); Diaz v. Goat Express, LLC, 3:20CV3986-TKW-HTC, 2021 WL 7541409, at *3 (N.D. Fla. Oct. 15, 2021) (citing Sanchez Farms LLC v. S. Agcom Inc., No. 1:14CV55-MW/GRJ, 2017 WL 5201795, at *2 (N.D. Fla. Jan. 11, 2017))
[103] Doc 192, pg14.

any supplies, materials or equipment used in connection with the project."[104] As an initial matter, the undefined term "project" is, at best, ambiguous.[105] The definition in the COC Exclusion includes the very term it seeks to define, adding further ambiguity and requiring that the language be construed in favor of coverage.[106]

This ambiguity is further evidenced by the COC Exclusion's own recitation of what "project" "includes." A strict reading of the COC Exclusion - inserting the expressly stated meaning of "project" incorporated therein - yields the following:

> Any "property damage" at or to any [***buildings or structures***] insured under this policy during the course of construction until the [***building or structure***] is completed.

Thus, interpreting the COC Exclusion ***using its own terms*** reveals that it is susceptible to at least one reasonable interpretation that both provides coverage *and*

---

[104] Doc 96-1, pg 45 (emphasis added).

[105] Other courts have had occasion to interpret the term "project" in the context of a course of construction exclusion in a CGL policy and have found that term ambiguous. See Shy v. Ins. Co. of Pennsylvania, CV101415DSFMANX, 2011 WL 13213664, at *3 (C.D. Cal. Sept. 28, 2011); see also Houston Specialty Ins. Co. v. Vaughn, 8:14-CV-1187-T-17JSS, 2017 WL 11474046, at *3 (M.D. Fla. Feb. 2, 2017) ("[The] trier of fact must also determine the applicability of the undefined (i.e., ambiguous) term "construction project" in Plaintiff's insurance policy—which, with Plaintiff the drafter of the policy, this Court must "liberally construe" the term in favor of Defendants.").

[106] Board of Directors of Regal Lofts Condominium Ass'n, 764 F. 3d. at 734; Atwood v. St. Paul Fire & Marine Ins. Co., 363 Ill. App. 3d. 864, 864 (2006).

is consistent with the PCOH, i.e., the exclusion would not apply to buildings or structures once those buildings or structures are completed.[107]

Remarkably, despite its refusal to use the clear and express definitions of "complete" set forth in the Policy and applicable to this Loss, the District Court took the opposite approach in its effort to broadly interpret the underlined term "project." In so doing, the Court referenced an *unrelated part of the Policy* to determine that "the most natural reading" of the term was to define it using the Designated Project description in Endorsement No. 26.[108] However, the COC Exclusion **does not** use – or even reference – the Designated Project description in Endorsement No. 26. Had Liberty intended for Endorsement No. 26 to apply to or define the term "project" in the COC Exclusion, it could have, and should have, written the Policy accordingly. Instead, Liberty chose to use the ambiguous, undefined, term "project", and the District Court was required to resolve that ambiguity in favor of coverage and in a manner which gave effect to the Policy as a whole, which it failed to do.

*This confirms the fatal logical flaw and outcome of the District Court's analysis:* on the one hand, the Court imported a "project" definition from a wholly unique location in the Policy to interpret the COC exclusion (this despite controlling terms within the exclusion); on the other hand, it compartmentalized and segregated

---

[107] Greenway Vill. S. Condo. Associations I, II, III & IV, Inc. v. Roach, 397 So. 2d 954, 956 (Fla. 4th DCA 1981).
[108] Doc 192, pg 12.

the Policy definition of "completed" in the PCOH. A consistent approach, either way, results in the COC exclusion not applying, and coverage for Kaufman.

In sum, the Loss did not occur "during the course of construction," the damaged buildings were indisputably "completed" pursuant to the express definitions set forth in the Policy, and the term "project" is demonstrably ambiguous. For these reasons, the COC Exclusion cannot apply to the Loss, and the District Court's decision must be reversed.

### c. Liberty has the Burden to Demonstrate the Application of the Exclusion, and it has not – and cannot – do so.

As set forth above, the burden to demonstrate the applicability of an exclusion rests squarely with the insurer.[109] It is undisputed that the COC Exclusion is a coverage exclusion – requiring that <u>Liberty</u> prove that the exclusion applies to preclude coverage for the Loss. Liberty has not – and cannot – satisfy its burden. In fact, Liberty conceded that the damaged buildings were complete at the time of the loss[110] – it strategically sought to use the COC Exclusion as a mechanism to avoid its obligations to Kaufman under the Policy predicated solely on the fact that the *entirety of the project* was not complete.

---

[109] <u>U. S. Fid. & Guar. Co. v. Helms</u>, 413 So. 2d 767, 768 (Fla. 3d DCA 1982) (<u>Liberty Mutual Insurance Company v. Flitman</u>, 234 So.2d 390 (Fla. 3d DCA 1970)).
[110] Doc 148-36, pg 36.

From the inception of its analysis, the District Court used an improper lens –

it placed the burden on <u>Kaufman</u> to establish that the COC Exclusion *did not apply*

to the Loss.  A cursory review of the Omnibus Order demonstrates that the District

Court failed to provide *any* analysis or authority regarding Liberty's burden – let

alone whether this burden was satisfied.

To the contrary, the Omnibus Order is replete with examples of shifting the

burden to *Kaufman* to prove that the Loss was *not* barred by the COC Exclusion.

For example, the District Court: (1) scrutinized *Kaufman*'s arguments against

application of the COC Exclusion based upon the PCOH definition of the term

"complete" within the Policy;[111] (2) concluded that *Kaufman's* "**entire defense and**

**counterclaim** hingers on **<u>*its ability*</u>** to import the PCOH definition of complete into

the COC [Exclusion];"[112] and (3) never addressed *any argument* set forth by Liberty,

nor provided any analysis as to whether Liberty met its burden to prove that the

exclusion applies.[113]

Simply put, Florida law expressly places the burden on *Liberty* to demonstrate

the application of the exclusion, and Liberty has not – and cannot – establish *as a*

*matter of law* that the COC Exclusion applies to the Loss. Indeed, the above

examples demonstrate that the District Court failed to place the appropriate burden

---

[111] Doc 192, pg 13.

[112] Doc 192, pg 15.

[113] <u>See</u> Doc 192.

on Liberty, instead requiring *Kaufman* to establish that the COC Exclusion did not apply.[114] For this reason alone, the Omnibus Orders are patently in error and must be reversed.

## II. Applying the COC Exclusion to the Loss Creates an Impermissible Coverage Gap.

Florida law also requires that insurance policies be construed to avoid gaps in coverage.[115] This principle applies acutely where multiple insurance policies are designed to complement one another, such as Liberty's project-specific liability Policy and builder's risk insurance, which is a first-party property policy covering property damage during the course of construction.[116]

In Farrer v. U.S. Fid. & Guar. Co., 809 So. 2d 85, Florida's Fourth District Court of Appeal examined an exclusion in a commercial general liability policy in context with coverage afforded under an automobile liability policy. Noting that "[a]n automobile policy protects its insured for liability arising out of the use of [the] vehicle, while the general liability excludes coverage arising from the use of the

---

[114] Morette Co. v. S.-Owners Ins. Co., 301 F. Supp. 3d 1175, 1185 (N.D. Fla. 2017) (citing LaFarge Corp. v. Travelers Indem. Co., 118 F.3d 1511, 1516 (11th Cir. 1997)).

[115] Farrer v. U.S. Fid. & Guar. Co., 809 So. 2d 85, 94–95 (Fla. 4th DCA 2002); State Farm Mut. Auto Ins. Co. v. Spahn, 8:12-CV-2619-T-23, 2013 WL 5532761, at *4 (M.D. Fla. Oct. 7, 2013) ("The Florida precedent clarifies that Florida disfavors an overlap in, or a gap in, insurance coverage."); Sunshine State Ins. Co. v. Jones, 77 So. 3d 254, 262 (Fla. 4th DCA 2012).

[116] See Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 845 So. 2d 161, 165 (Fla. 2003).

vehicle,"[117] the Court reasoned that those clauses are complementary and held that the "comprehensive general liability policy should be construed as leaving no gap in coverage between it and an automobile policy."[118] In so holding, the Court advanced Florida's public policy that interpretation of complimentary policies achieves a result that neither creates overlapping coverage nor any coverage gap between the two policies.

The same calculus from Farrer applies here. Liberty issued a general liability policy for a specific construction project which would be separately insured under a builder's risk policy. Because builder's risk coverage includes property damage occurring "during the course of construction,"[119] Liberty inserted the COC Exclusion to exclude that same risk from its liability Policy. The program was designed such that the damaged buildings would have been covered by the builder's risk policy *while they were in the course of construction,* and by the subject Policy after the buildings were completed and put to their intended use. Given that the two policy types are designed to work in tandem and complement one another, the law requires that the COC Exclusion be construed to prevent a gap in coverage between the builder's risk and the Liberty Policy.[120]

---

[117] Farrer, 809 So. 2d at 95.

[118] Id.

[119] Id.

[120] Doc 148-36, pg 36 (emphasis added) (Liberty's adjuster, Lorna Dorne-Smith, stating, unequivocally, "**No builders risk as the project was completed**.").

The District Court plainly conceded that applying the COC Exclusion in this case would create a gap in coverage, observing, "the only loss **is the gap** between parts of the Project being put to use and the entire Project being complete."[121] Thus, the District Court consciously created an avoidable gap in coverage when it improperly applied the COC Exclusion – leaving Kaufman without the insurance coverage for which it paid. This interpretation is contrary to Florida's public policy, and the District Court decision should therefore be reversed.

## III. Kaufman has Standing to Assert its Claim for Reformation of the Policy

Florida law dictates that reformation be granted when "the parties can demonstrate - with clear and convincing evidence - that the contract does not reflect the parties' mutually agreed-upon terms […]"[122] Kaufman has demonstrated standing to assert its claim for Reformation against Liberty by satisfying the three requirements for standing: injury in fact, causation, and redressability.[123] Specifically, Kaufman has sustained a (1) significant financial injury (2) as a direct result of Liberty's unilateral alteration of the Policy language, and (3) reformation will rectify this injury to Kaufman.

---

[121] Doc 192, pg 15 (emphasis added).

[122] Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n, 8 F.3d 760, 767 (11th Cir. 1993).

[123] Spokeo, Inc. v. Robins, 578 U.S. 330, 338, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016), as revised (May 24, 2016); Hunstein v. Preferred Collection & Mgmt. Servs., Inc., 48 F.4th 1236, 1242 (11th Cir. 2022); City of S. Miami v. DeSantis, 424 F. Supp. 3d 1309, 1320 (S.D. Fla. 2019).

In its Second Omnibus Order, the District Court concluded Kaufman lacked standing to bring its counterclaim for Reformation because it was not seeking a refund of premiums for the buildings Liberty omitted from the Project description in Endorsement No. 26.[124] Without analysis of the aforementioned requirements for standing, or whether Kaufman satisfies them, the District Court determined that it "would stand to reason that Kaufman would seek to have its premiums refunded. . . [i]nstead, Kaufman merely seeks to reform the Policy. . ."[125]

Thus, rather than adjudicate the question of standing on the merits, the District Court questioned the sensibility of the remedy Kaufman rightfully seeks, and nevertheless concluded Kaufman lacks standing.[126] A refund of premiums does *not* equate to reformation of the Policy, which is necessary to ensure the Policy provides appropriate insurance coverage for the Project throughout the entirety of the statute of repose. Therefore, the District Court's dismissal of Kaufman's counterclaim for Reformation must be reversed.

---

[124] Doc 213, pg 4.

[125] Id.

[126] Id. at 5 ("I fail to understand how Kaufman is actually injured if it is not seeking to recover premiums for the buildings it never built, but (according to Kaufman) were baked into the premium calculation.").

### i. Kaufman suffered an "injury in fact" by paying premium to Liberty for an insurance policy that did not correctly capture the negotiated terms.

Kaufman suffered a cognizable and imminent financial harm as a direct result of Liberty's mistaken drafting of Endorsement No. 26 because Kaufman paid to insure buildings and property – in a phased construction project – that Liberty omitted from the Policy.

The premium for the Project was based upon the overall value of the Project as described in Kaufman's Application.[127] Liberty's definition of the Project, contained in Endorsement No. 26 of the Policy, *excludes* parts of the project; to wit, the amphitheater structure, hardscaping, landscaping, water features (foundations, reflecting pools), 2-story training and conference center, and a sports and recreation building, all of which were expressly itemized in the Application and considered in calculation of the premium.[128] Consequently, Liberty's erroneous description of the project allowed it to collect a premium for portions of the project that were not expressly covered in the Policy as issued.[129]

Kaufman, therefore, suffered a cognizable financial harm when it did not receive the Policy for which it paid, and has standing to assert its claim for reformation.

---

[127] Doc 148-5; Doc 195-1.
[128] Doc 148-5; Doc 195-1.
[129] Doc 195-1.

### ii. Liberty's change of the project description directly injured Kaufman.

Liberty's mistaken drafting directly resulted in a Policy that lacks the intended coverage for the Corporate Campus – namely, the coverage Kaufman sought and purchased – which is the precise circumstance in which reformation is appropriate. Kaufman's CCIP Submission for the Policy to Liberty's underwriter, Danielle Stewart, attached the Master Site Plan and Kaufman's Application – which included a description of the Corporate Campus.[130] However, during the underwriting process, Ms. Stewart mistakenly drafted Endorsement No. 26,[131] resulting in a Policy that lacks the intended coverage – coverage Kaufman bargained and paid for – such that Liberty's conduct directly caused Kaufman's injury.

### iii. Reformation would remedy Kaufman's injury.

Reformation of the Corporate Campus description in Endorsement No. 26 of the Policy to reflect the complete, phased project description will rectify the injury to Kaufman by ensuring Kaufman has coverage that it bargained and paid for. Liberty has collected premiums for coverage its Policy does not provide, which reformation will cure. Thus, Kaufman has standing to bring its counterclaim for Reformation and the District Court's dismissal of Kaufman's counterclaim must be reversed.

---

[130] Doc 148-7, pg 30.
[131] Id. at 40.

## Conclusion

For the reasons set forth above, this Court should reverse the Omnibus Orders and enter an Order: (1) concluding, as a matter of law, that the COC Exclusion does not apply to the Loss; (2) declaring that Liberty must defend and indemnify UGS in the Underlying Action; (3) remanding Kaufman's Breach of Contract Claim to the District Court; and (4) reversing the District Court's dismissal of Kaufman's counterclaim for reformation.

/s/ Gregory D. Podolak
Gregory D. Podolak
Jonathan Chambers
Saxe Doernberger & Vita, PC
999 Vanderbilt Beach Rd, Ste 603
Naples, FL  34108
(239) 315-4215

Eve-Lynn Gisonni
Stacy Manobianca
Rachel Pearson
Leena Phaguda
Saxe Doernberger & Vita, PC
35 Nutmeg Dr, Ste 140
Trumbull, CT  06611
(203) 287-2100
*Counsel for Defendant/Appellant*

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND
## TYPE-STYLE REQUIREMENTS

This document complies with the word limit of FRAP 32(a)(7) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 8,398 words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).

/s/ Gregory D. Podolak
*Counsel for Appellant*

Dated: November 1, 2023

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 1st day of November, 2023, I caused this Appellant's Brief to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ Gregory D. Podolak
*Counsel for Appellant*