No. 23-12715-F

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE ELEVENTH CIRCUIT

_____

Liberty Surplus Insurance Corporation,

*Plaintiff-Appellee,*

v.

Kaufman Lynn Construction, Inc.

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Florida

No. 9:22-cv-80203-DMM

_____

### BRIEF OF AMICI CURIAE ASSOCIATED GENERAL
### CONTRACTORS OF AMERICA, SOUTH FLORIDA CHAPTER OF THE
### ASSOCIATED GENERAL CONTRACTORS OF AMERICA, ASSOCIATED
### GENERAL CONTRACTORS FLORIDA EAST COAST CHAPTER,
### NATIONAL ASSOCIATION OF HOME BUILDERS, AND FLORIDA
### HOME BUILDERS ASSOCIATION IN SUPPORT OF APPELLANT
### KAUFMAN LYNN CONSTRUCTION, INC

_____

Patrick J. Wielinski
Cokinos | Young
One Galleria Tower
13355 Noel Rd., Suite 1375
Dallas, TX 75240
Telephone: 817-635-3620
Email: pwielinski@cokinoslaw.com

*Counsel for Amici Curiae*

No. 23-12715-F

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

Liberty Surplus Insurance Corporation,

*Plaintiff-Appellee*,

v.

Kaufman Lynn Construction, Inc.

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Florida

No. 9:22-cv-80203-DMM

_____

## Certificate of Interested Persons and
## Corporate Disclosure Statement

Pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1(a), Amici Curiae Associated

General Contractors of America, South Florida Chapter of the Associated General

Contractors Of America, Associated General Contractors Florida East Coast Chapter,

National Association of Home Builders, And Florida Home Builders

Association, all non-governmental parties, hereby state that they are not subsidiaries

or affiliates of a publicly owned corporation, there is no publicly owned corporation,

not a party to this appeal, that has a financial interest in the outcome of same, and there

is no parent company or publicly held corporation that owns 10% or more of any Amici Curiae's stock. Amici Curiae further disclose all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party as follows:

1. Associated General Contractors of America,

2. Associated General Contractors Florida East Coast Chapter

3. Blevins, Bryant

4. Butler Weihmuller Katz Craig LLP

5. Chambers, Jonathan W.

6. Cokinos | Young

7. Florida Home Builders Association

8. Gisonni, Eve-Lynn

9. Kaufman Lynn Construction, Inc.

10. Liberty Surplus Insurance Corporation

11. Manobianca, Stacy M.

12. Middlebrooks, Donald M.

13. National Association of Home Builders

14. Peckar & Abramson. P.C.

15. Pearson, Rachel S.

16. Podolak, Gregory D.

17. Rooney, Carol Marie

18. Rosengarten, Yonit

19. Ryan, Fay E.

20. Salomon, Stefanie A.

21. Saxe Doernberger & Vita, P.C.

22. South Florida Chapter of the Associated General Contractors of America

23. United Glass Systems, Corp.

24. Wielinski, Patrick J.

25. Zavell, Alec J.

Pursuant to 11th Cir. R. 26.1-3(b), Amici Curiae certify that to the best of their knowledge there are no publicly traded companies or corporations that have an interest in the outcome of this appeal.

# Table Of Contents

Certificate of Interested Persons and Corporate Disclosure Statement ................C-1

Table of Contents .................................................................................................. i

Table of Citations ............................................................................................... iii

Interest of Amici Curiae ....................................................................................... 1

Statement of the Issues ......................................................................................... 4

Summary of the Argument .................................................................................... 4

Argument ............................................................................................................... 6

    I.    Liberty's Careless Underwriting and Misapplication of
        its Course of Construction Endorsement Threatens the Entire
        Construction Industry ............................................................................ 6

    II.   Liberty Ignores the Industry Intent Behind its Course of
        Construction Endorsement .................................................................. 11

    III.  The Course of Construction Endorsement Does Not Apply to the
        Property Damage to the Completed Phase 1 of the Project ............... 16

    IV.  Even the Careless Underwriting by Liberty Establishes Phase 1
        as Completed Under the Policy .......................................................... 19

    V.   The Course of Construction Endorsement is a Disingenuous
        Reduction of Standard CGL Coverage for Contractors ..................... 22

        A. The Course of Construction Endorsement Conflicts with
           Exclusion j.(6) in the Policy ......................................................... 23

B.  There is a False Dichotomy Between a Builders Risk Policy and a

CGL Policy Under a CCIP ............................................................26

Conclusion...........................................................................................27

Certificate Of Compliance .................................................................29

# Table Of Citations

**Cases**                                                                 **Page(s)**

*American Family Mut. Ins. Co. v. American Girl, Inc.,*

    268 Wis. 2d 16, 673 N.W.2d 65 (2004) ...................................................17

*Amerisure Mutual Ins. Co. v. Auchter Co.,*

    673 F.3d 1294 (11th Cir. 20212) ...........................................................17

*Factory Mutual Ins. Co. v. Peri Formworks Systems, Inc.,*

    223 F.Supp.3d 1133 (D. Or. 2016) ....................................................... 9

*Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.,*

    538 F.3d 365 (5th Cir. 2008) .................................................................24

*Kraft Co., Inc. v. J&H Marsh & McLennan of Fla., Inc.,*

    2006 WL 1876995 (M.D. Fla. July 5, 2006) ...........................................8

*Lamar Homes, Inc. v. Mid-Continent Cas. Co.,*

    242 S.W.3d 1 (Tex. 2007) ......................................................................17

*Mid-Continent Cas. Co. v. JHP Dev., Inc.,*

    557 F.3d 207 (5th Cir. 2009) .................................................................23

*Swire Pacific Holdings, Inc. v. Zurich Ins. Co.,*

    845 So.2d 161 (Fla. 2003) ......................................................................18

*U.S. Fire Ins. Co. v. J.S.U.B.,*

    979 So.2d 871 (Fla. 2007) .................................................................. 17, 24

*Westfield Ins. Co. v. Miller Architects & Builders,*

    949 F.3d 403 (8th Cir. 2020) .................................................................24

*Zurich American Ins. Co. v. Acadia Ins. Co.,*

    243 F.Supp.3d 1201 (D. Colo. 2017) ................................................... 9

**Statutes**

Fla. Stat. 95.11 ..............................................................................21

**Other Authorities**

Macrina Wilkins, THE ECONOMIC IMPACT OF CONSTRUCTION

IN THE UNITED STATES AND FLORIDA, AGC of America, Sept. 2023......11

Rick Beran, *When and Why to Consider Construction Phasing and*

*Sequencing*, THE SAMUELS GROUP (Dec. 20, 2021), .............................14

https://www.samuelsgroup.net/blog/construction-phasing-and-sequencing

## Interest Of Amici Curiae

This Amici Curiae brief is sponsored by national and state chapters of some of the largest construction trade associations in the United States. The sponsorship of these national organizations, in addition to their Florida chapters, underscores the importance of the insurance coverage issues to be addressed by the Court in this proceeding for Florida construction businesses, as well as construction businesses on a national basis.

**Associated General Contractors of America (AGCA)** is a nationwide trade association of commercial construction companies and related firms. It has served the construction industry since 1918, and over time has become the recognized leader of the construction industry in the United States. The association now has more than 27,000 member firms, including 7,000 of America's leading general contractors, nearly 9,000 specialty contracting firms and more than 11,000 service providers and suppliers that belong to the association through its nationwide network of eighty-nine chartered chapters. AGC members are engaged in building, heavy, civil, industrial, utility, and other construction for both public and private property owners and developers.

**South Florida Chapter of The Associated General Contractors of America (South Florida AGC)** was formed in 1922 and has proudly served South Florida's contractors for over one hundred years. The South Florida AGC helps

develop successful construction contractors through local, state, and national advocacy services, peer networking opportunities, and safety and industry-specific education. The membership is composed of general and prime contractors, specialty contractors, suppliers, and service providers working in commercial construction.

**Associated General Contractors Florida East Coast Chapter (AGC FEC)** is a commercial construction industry organization, representing a diverse membership that includes general contractors, specialty contractors, suppliers, and service providers in eight counties of Florida. Since its establishment in 1949, the chapter has played a pivotal role in advocating for and shaping the construction industry. AGC FEC encompasses various disciplines within the construction field, ranging from commercial construction to high-end residential, heavy highway, and more. Over the course of 73 years, AGC FEC has consistently safeguarded its members' interests and remains a driving force in the commercial, industrial, and municipal construction sectors. The chapter's governance structure underscores its commitment to promoting leadership, integrity, education, networking, and alliances, all aimed at enhancing the success of its members.

**National Association of Home Builders (NAHB)** is a trade association representing more than 140,000 builder and associate members organized into approximately six hundred affiliated state and local associations in all fifty states, the District of Columbia, and Puerto Rico. NAHB has an interest in seeing that

suppliers of housing can do the job they are most qualified to do, that is, to build and operate affordable housing for millions of Americans. NAHB is the voice of the American shelter industry, and its members construct over 80% of the housing in the United States. NAHB's goals are to promote home ownership, foster a healthy and efficient housing industry, and to promote policies that will keep safe, decent, and affordable housing a national priority.

**Florida Home Builders Association (FHBA)** is a Florida not-for-profit corporation that has more than 8,000 members throughout the State of Florida. FHBA is affiliated with the NAHB and has 23 local/regional affiliated home builders associations throughout the State of Florida. FHBA aims to "serve, advance and protect the welfare of the home building industry in such a manner that adequate housing will be made available by private enterprise to all Americans." FHBA's core mission is to create a climate in which the construction industry can prosper. FHBA enjoys a legacy that spans more than 70 years.

Because of their unique perspectives as influential representatives of broad segments of the construction industry, these organizations have all submitted amicus curiae briefs in numerous jurisdictions on issues similar to those before this Court. Moreover, they have a great interest in the many risks that inhere in the construction process, and insurance has long played a significant role for their members in managing those risks. Whether AGC or NAHB members can depend on their

liability insurance policies to provide some reasonable degree of protection against financial harm as marketed by the insurance industry is a matter of continuing and urgent interest to the members of all of these organizations. Consequently, though Amici Curiae are not parties to this appeal, this brief was filed by Amici Curiae through the undersigned independent counsel, who was paid a fee by them for its preparation.

## Statement of Issues

1. Whether the District Court erred when it interpreted a Course of Construction Endorsement to preclude coverage for damage to completed buildings in the face of an applicable definition of "products-completed operations hazard in the same policy?

2. Whether the Course of Construction Endorsement as applied to property damage to an entire project conflicts with and contravenes a more limited operations exclusion in the policy?

## Summary of the Argument

A contractor-controlled insurance program ("CCIP") is purchased by a general contractor to provide all participants in the insured construction project – the general contractor, the owner and all subcontractors – with dependable and affordable insurance coverage under a single commercial general liability ("CGL") insurance policy. A defining characteristic of the CGL policy is the provision of coverage for liability that falls within two hazards. The first is coverage for property

damage that occurs during the course of construction of the project, that is "operations" claims. The other is property damage that occurs after the project, or a portion of the project, is released for occupancy and its intended use, i.e., a "completed operation." The operations/completed operations dichotomy is maintained in all standard CGL policies and is accomplished through an elaborate set of exclusions and definitions that apply to each hazard.

However, insurance products, including the CCIP, have been developed to address the increasing complexities facing the construction industry. One is the need to ensure that completed operations coverage can be maintained for an extended period of time, and a hallmark of the CCIP is coverage that extends throughout the period of a state's statute of repose. Another purpose of a CCIP is to ensure that all participants, including smaller subcontractors, enjoy the same scope of coverage due to the increasing size and complexity of modern construction projects.

The project on this appeal presents a microcosm of these issues. Like many large projects, the construction sequencing and financing dictated that it be built for phased occupancy by the owner. Under the terms of the CGL policy, each phase is deemed a completed operation for purposes of triggering the coverage extending through the period of repose. Unfortunately, the district court, based on less than clear underwriting of the policy and disingenuous arguments by Liberty, ignored the terms of the CGL policy before it and held that all phases of a project must be

completed in order for the completed operations coverage to be triggered.

In doing so, the district court applied a course of construction exclusion that by sleight of hand replaced deleted property damages exclusion with a more onerous exclusion denying coverage for any property damage occurring during construction operations. The ramifications of such an exclusion are extreme for the participants under a CCIP, depriving them of coverage and a defense in many instances. Such a reading of the CCIP policy violates basic tenets of industry-wide understanding and application of completed operations coverage and must be reversed for the benefit of all construction insureds, both in Florida and the United States.

## Argument

### I. Liberty's Careless Underwriting and Misapplication of its Course of Construction Endorsement Threatens the Entire Construction Industry

Amici Curiae, as well as other businesses engaged in construction, including Appellant, Kaufman Lynn Construction, Inc. ("Kaufman"), confront roadblocks to recovery under their insurance policies on an alarmingly regular basis in trying to manage the considerable risks associated with their endeavors. While contractors and subcontractors strive and usually succeed in providing quality construction services to owners and upper tier contractors, occasionally inadvertent mistakes occur, mistakes that can result in defects in construction.

Commercial general liability ("CGL") policies insure nearly all participants in the construction industry, including non-residential general contractors, residential homebuilders, subcontractors and material and equipment suppliers, together with all other parties that are affected by defective construction.[1] These parties include project owners, both public and private, as well as homeowners. Insureds have always paid substantial premiums for liability insurance to provide protection from liability for the property damage arising out of construction defects.

Due to the presence of multiple parties in close proximity and the contractual relationships between those parties on a project, the construction industry presents unique challenges of insured risks. This is especially true considering that all tiers on a project traditionally maintain separate insurance to protect their own interests.

These multiple layers of insurance frequently result in duplication of coverage and just as frequently, finger pointing and disputes among the insurers that issued the policies. The excessive cost of duplicative insurance programs maintained throughout the tiers was a significant factor in developing an insurance product targeted particularly at construction insureds – the controlled insurance program ("CIP") or ("wrap-up"). A wrap-up is an insurance/risk management/safety program

---

[1] This brief often uses the generic terms "contractor" or "builder." These terms include home builders; subcontractors; and non-residential commercial building, industrial, heavy highway/civil, and utility contractors; and other participants in the construction industry, unless otherwise indicated.

provided to all of the parties on a construction project: owner, general contractor, subcontractors, and sub-subcontractors through the lower tiers. Smaller subcontractors, offsite fabricators and suppliers were usually not included. The core of the wrap-up is CGL and umbrella liability insurance. Wrap-ups are becoming a preferred mode to insure large eligible projects.

Both the elimination of duplicative insurance coverage and internecine conflicts between insurers as to a specific claim spurred the desire to achieve economies of scale and cost savings. Moreover, the ability to theoretically provide better coverage increased the impetus of many owners and general contractors to consider this option. For example, the inability of many subcontractors to obtain effective construction defect coverage, particularly in residential construction, has caused owners and general contractors to consider wrap-up policies on their projects. A wrap-up can be sponsored by an owner, referred to as an owner-controlled insurance program ("OCIP"), or it can be sponsored by a contractor, referred to as a contractor-controlled insurance program ("CCIP").

The insurance program before this court is a CCIP purchased and sponsored by Kaufman for its operations on the JM Family Corporate Campus, the construction project that is at the center of this dispute (the "Project"). This type of CCIP has been recognized by numerous courts: *Kraft Co., Inc. v. J&H Marsh & McLennan of Fla., Inc.*, 2006 WL 1876995 *1 (M.D. Fla. July 5, 2006) (a CCIP seeks to distribute,

share, and manage risk at construction sites, allowing a single insurance carrier to provide the varying coverage for all contractors at a single construction site); *Zurich American Ins. Co. v. Acadia Ins. Co.,* 243 F.Supp.3d 1201, 1208 (D. Colo. 2017) (OCIPs are "more equitable, uniform and efficient" eliminating costs of overlapping coverage and delays caused by coverage as well as other types of disputes between parties involved in the project); *Factory Mutual Ins. Co. v. Peri Formworks Systems, Inc.*, 223 F.Supp.3d 1133, 1143 (D. Or. 2016)(an OCIP is a type of "wrap-up" insurance program that "seeks to distribute, share, and manage risk at construction sites" by generally covering the owner or developer, contractors and subcontractors).

Unfortunately, the use of wrap-up insurance programs has often engendered considerable controversy among owners and contractors as to the relative benefits and problems associated with them. On one hand, owners point to the economies of scale that can be achieved through an OCIP, as well as extended coverage, particularly for long tail property damage claims involving defective work, frequently through the running of a statute of repose. At the same time, contractors point to negatives such as coverage gaps, disruption of their own insurance programs and simple mismanagement associated with some wrap-ups. Attempting to address these issues, some contractors, like Kaufman, have moved toward sponsorship of their own CCIPs for their larger projects.

On occasion the well-meaning efforts of a contractor can be thwarted by its own CGL insurer within the wrap-up, especially as to the defective construction claims as alleged here against Kaufman by JM, the owner. Despite the marketing by the insurance industry, including Liberty, of CCIPs as a panacea for the risks faced by participants on a large construction project, a CGL policy can leave participants with yawning gaps in coverage.

Like many wrap-up insurers, Liberty has inserted a "Course of Construction Endorsement" into its policy in the guise of expanding coverage by excluding course of construction exposures while deleting several other more limited exclusions generally applicable to property damage under a standard form CGL policy. The net effect is a loss of coverage for the insureds. Here, Liberty goes even further by attempting to over-extend the scope of its Course of Construction Endorsement to Phase 1 of the Project. That Phase had already been completed under the express terms of the Liberty policy and Florida law. The result is that Kaufman has been robbed of millions of dollars of products-completed operations coverage for which an expensive premium was paid.

By denying coverage for otherwise valid claims presented by construction insureds, Liberty and similarly situated insurers place construction businesses at a competitive disadvantage because they are unable to rely on the legitimate transfer of risks to their insurers. This is a genuine concern, not only for the Florida

construction industry, but the entire country, considering the construction industry contributed $1.1 trillion (4% projected for 2023), and $75 billion (5.1% in 2022), to the U.S. and Florida GDP, respectively.[2] As set out below, construction insureds should be able to count on the intended transfer of risk under their CCIP CGL policies in support of their businesses. If left unchecked, the exclusion of coverage through the Course of Construction Endorsement will only spread to other segments of the construction industry in this country.

The Amici Curiae unanimously urge the Court to apply the policy before this Court in accordance with its explicit terms to provide the policyholders with the intended scope of coverage, and in doing so, reverse the incorrect analysis of the District Court.[3]

## II.    Liberty Ignores the Industry Intent Behind its Course of Construction Endorsement

Under no stretch of the imagination, the facts, or the terms of the Liberty policy, can the property damage to the Project caused by Tropical Storm Eta in November of 2020 be regarded as a course of construction loss. The City of

---

[2] Macrina Wilkins, THE ECONOMIC IMPACT OF CONSTRUCTION IN THE UNITED STATES AND FLORIDA, AGC of America, September 2023.

[3] While Amici Curiae have limited their arguments in this brief to coverage issues as to the applicability of a Course of Construction Endorsement to completed work, they support and adopt the position of Kaufman as to reformation as a remedy to eliminate the incongruity of the description of the "project" inserted by Liberty.

Deerfield Beach, where the Project was located, issued temporary certificates of occupancy ("TCOs") for the occupied Phase 1 buildings on July 10, 2020.[4] The tropical storm occurred after the certificates of occupancy were issued for Phase 1 of the Project which JM already occupied. Upon issuance of the certificates of occupancy, and after which the Phase 1 buildings were put to their intended use, Phase 1 was complete, and was a completed operation under the terms of the Liberty policy.

The judgment in favor of Liberty must be reversed upon careful review and harmonizing of the policy provisions before this Court. One such provision is the "Limitation of Coverage to Designated Premises or Project Endorsement" that sets out the project to be insured under the CCIP:

> Demolition of (5) five existing buildings and New, Ground-Up Construction of (2) two (4) four-story steel SE concrete office buildings, (1) one (2) two-story dining hall, a 6k square foot, central energy plant, and a (6) six-story precast parking garage, as well as any operations within 1,000 feet of the designated project that are necessary and incidental thereto.[5]

---

[4] The two occupied office buildings and the dining hall building, along with the parking garage and the central energy plant, comprised the "Phase 1 Buildings." Doc. 148-2 p. 14, p. 32; Doc 148-1, p. 155; Doc 148-17. On the other hand, a final certificate of occupancy for the parking garage was issued months earlier, on March 12, 2020; Doc 148-16. The central energy plant was completed prior to completion of the rest of Phase 1. Because the central energy plant was not an occupied building, it did not receive a certificate of occupancy; Doc 148-1, pp. 222-224.

[5] Doc 96-1, p. 62.

Despite the obvious importance of the description of the single Project to which the CCIP policy applied, Liberty's description fell far short of the actual Project as described in the contract between Kaufman and JM for the actual Project, which was provided to Liberty. That description required construction to be performed in two separate and distinct phases as follows:

> Phase 1: 2x2 x 4-story steel and concrete office buildings (57k sq ft), a 2-story dining hall (27k sq ft), central energy plant (power, chillers, cooling tower, fire pump, emergency generator) (6k sq ft), 6-story precast parking garage (5 levels of parking, roof lid with solar panels) (306k sq ft)

> Phase 2: Demolish 5 existing buildings, 4-story steel and concrete office building (28k sq ft), 2-story training and conference center (35k sq ft), sports and recreation building (gym, basketball court, locker rooms, showers) (25k sq ft), amphitheater structure, hardscaping, landscaping, water features (fountains, reflecting pools). [6]

One of the theoretical underpinnings of a CCIP program is the improved coverage provided under the program for all participants – owner, general contractor, subcontractors, and sub-subcontractors. Unfortunately, that intent falls far short in terms of course of construction coverage on the Project. The contract was clear as to the separate phases, so that the new Phase 1 buildings could be completed for occupancy before the existing buildings could be vacated and demolished.

---

[6] Doc 148-9.

This type of phased construction is commonplace in construction planning, particularly in a renovation project:

> Construction phasing and sequencing is an approach to building expansion or renovation that **completes the construction process in phases rather than linearly**, allowing a company to remain operational and continue to bring in revenue.

> During the planning process, the project owner and construction manager will work closely together to outline when and how various portions of the project will take place to minimize disruptions. In general, **phased construction is made up of several series of smaller building projects** that take place at different times rather than working on an entire project at one time.[7]

This is exactly the type of planning and execution used in the Project. But Liberty seeks to use its own misguided combination of Phases 1 and 2 to argue that even though Phase 1 was completed and occupied at the time of the occurrence of the property damage, it was still within the course of construction because the entire Project (as wrongly described in the policy) was not yet complete. The underwriting is seriously jumbled, and Liberty's use of it as a sword to deny coverage to its insured is brazenly disingenuous. This interpretation also flies in the face of the terms of the policy and Florida law.

---

[7] Rick Beran, *When and Why to Consider Construction Phasing and Sequencing*, THE SAMUELS GROUP (Dec. 20, 2021), https://www.samuelsgroup.net/blog/construction-phasing-and-sequencing.

Endorsement No. 15, the Course of Construction Endorsement to the policy, provides:

> This insurance does not apply to:
>
> 1. Any "property damage" at or to any project insured under this policy during the course of construction until the project is completed.
>
> 2. Any obligation to investigate, settle or defend or indemnify any person, any claim or "suit" arising out of, or related in any way, either directly or indirectly to any "property damage" at or to the project during the course of construction until the project is completed.
>
> Solely for the purpose of this endorsement:
>
> Construction includes, but is not limited to, construction, renovation, repair, remodel, rehabilitation, demolition, excavation or landscaping.
>
> Project includes, but is not limited to, buildings or structures and any supplies, materials, or equipment, used in connection with the project.
>
> All other terms and conditions of the policy remain unchanged.[8]

The term "project" is circularly defined in the Endorsement as the "project." Moreover, the "project" is described, but not defined, in Endorsement No. 26 in the jumbled and inaccurate manner described above. Again, this circumstance suits the apparent purpose of Liberty in handling this claim, that is, to hopelessly combine all elements of the Project, ignoring the separate Phases 1 and 2 in order to extend the

---

[8] Doc 96-1, p. 45.

scope of the Course of Construction Endorsement by arguing that the entire Project was in the course of construction at the time of the property damage.

### III. The Course of Construction Endorsement Does Not Apply to the Property Damage to the Completed Phase 1 of the Project

The underwriting behind the elimination of the more limited operations exclusion with the absolute Course of Construction Endorsement is ignored where an insurer such as Liberty seeks to apply the same Course of Construction Endorsement to a completed operation such as Phase 1. That conduct is even more egregious because Liberty seeks to benefit from its own loose identification of the insured Project by muddling separate phases together. That effort is contrary to the terms of the policy that govern completion of a project, as well as applicable Florida law, specifically the statute of repose. It is also contrary to the construction industry's use of the term "completed."

Liberty's position makes a mockery of the careful demarcation between coverage for property damage that occurs during operations versus property damage within the products-completed operations hazard. As set out above, those exposures are treated in a radically different manner within the terms of the CGL policy.

The "products-completed operations hazard" is defined in relevant part as follows:

> **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, your work will be deemed completed at the earliest of the following times:

> **(a)** When all of the work called for in your contract has been completed.
>
> **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
>
> **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project. [hereinafter the "Completed Operations Definition][9]

Despite Liberty's attempt to run roughshod over it, there is nothing in the Course of Construction Endorsement or anything else in the policy that modifies this industry-wide and universally recognized definition and understanding applied in both the construction and insurance industries.

The Liberty policy is written on the CG 00 01 12 07 (2007) edition of the standard CGL policy.[10] This basic form has been in use since 1986. In the course of upholding coverage for the insured general contractor for property damage resulting from the defective work of its subcontractors, the Supreme Court of Florida, in *U.S. Fire Ins. Co. v. J.S.U.B.*, 979 So.2d 871, 877 (Fla. 2007), applied the completed operations definition, referring to the policy form as "post-1986." Other precedent recognizes the Completed Operations Definition as the definitive means to

---

[9] ECF Doc 96-1, p. 26-27.
[10] ECF Doc 96-1, pp. 9-28.

determine the status of an insured's work or project as completed. *See Amerisure Mutual Ins. Co. v. Auchter Co.*, 673 F.3d 1294, 1299 (11th Cir. 2012); *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1 (Tex. 2007); *American Family Mut. Ins. Co. v. American Girl, Inc.*, 268 Wis. 2d 16, 673 N.W.2d 65 (2004).

Despite its acceptance in the insurance industry – and the courts – the district court inexplicably refused to apply the Completed Operations Definition. Rather, it resorted to dictionary definitions, a practice sometimes engaged in by courts in attempting to divine the plain meaning of an undefined term in an insurance policy. Of course, a completed project is clearly defined in the Liberty policy and such interpretive machinations were unnecessary.

The district court, applying those dictionary definitions, determined that the Course of Construction Endorsement was not ambiguous even due to its failure to incorporate the Completed Operations Definition within it. That conclusion flies in the face of the admonition of the Florida Supreme Court that in interpreting an insurance policy, it is necessary to examine the policy in its context and as a whole, and to avoid simply concentrating on certain limited provisions to the exclusion of the totality of others. *Swire Pacific Holdings, Inc. v. Zurich Ins. Co.,* 845 So.2d 161 (Fla. 2003). In its analysis quoted above, the district court cited *Swire Holdings* approvingly, but proceeded to do the exact opposite by ignoring the Completed Operations Definition when interpreting the applicability of the endorsement. It

further ignored the fact that there was absolutely no need to define the term "completed," in the Course of Construction Endorsement, because it was already defined in the Completed Operations Definition.

Amici Curiae agree that there is no ambiguity between the Course of Construction Endorsement and the Completed Operations Definition. They are perfectly harmonious, and the application of the standard definition dictates that Phase 1 is a completed operation under the Liberty policy. That definition unambiguously provides that the insured's work is "completed" for purposes of completed operations coverage "when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project." That definition reflects modern construction practices and understanding. A certificate of occupancy had been issued for Phase 1 and JM had put the Phase 1 buildings to their intended use as offices prior to the property damage caused by Tropical Storm Eta. Even the careless underwriting of Liberty as displayed in the muddled description of the insured Project in Endorsement No. 26, the Designated Project Endorsement, cannot change that fact. The district court should be reversed on this issue.

## IV. Even the Careless Underwriting by Liberty Establishes Phase 1 as Completed Under the Policy

As is the case with most wrap-up policies, including the CCIP issued by Liberty to Kaufman, insurers essentially take a standard form CGL policy and slap

inconsistent endorsements upon it in an attempt to render it applicable to the single insured project. The inconsistencies contained in the description of the Project in Endorsement No. 26 have been extensively discussed above, particularly as to the Course of Construction Endorsement. Another key endorsement is Endorsement No. 31, the Extended Products-Completed Operations Hazard Endorsement.

All of these endorsements have one thing in common. They must be interpreted together with the Completed Operations Definition in order to be harmonized and meet the plain language standard under Florida law. Endorsement No. 31 states in relevant part for the extended completed operations coverage will apply if:

> b. (2) The "bodily injury" or "property damage" occurs during the policy period. However, solely with respect to liability for "bodily injury" or "property damage" included in the "products completed operations hazard", coverage under this policy shall be extended for an additional period of time (hereinafter referred to as the "Extension Period"). ***This Extension Period will begin on the date "your work" is deemed completed as defined by the applicable statue of repose provided by the controlling law of the jurisdiction where the project is located, or if no applicable statue [sic] of repose exists "your work" will be deemed complete as defined by the "products-completed operations hazard"***. "Your work" must be deemed completed during the policy period of this policy for coverage to apply. This Extension Period shall end when the period of time allowed by the applicable statute of repose of the controlling jurisdiction expires. Notwithstanding the foregoing, this Extension Period will not exceed ten (10) years from "your work" being completed unless the applicable statute of repose provides for a longer period of time. Any "bodily injury" or "property damage"

subject to this coverage extension will be deemed to have occurred on the date "your work" is deemed completed. (emphasis added)[11]

Unlike the Course of Construction Endorsement which is the centerpiece of Liberty's argument and the district court's Omnibus Order, the true centerpiece of a CCIP policy is the extension of the products-completed operations to the period of repose under applicable state law. The extension of the period of repose varies based upon the law of the state that applies to the policy, usually the state where the project is located. In Florida, that period of repose is seven years.[12] The purpose of this extension is to provide the owner, the general contractor, subcontractors, and all other participants in the wrap-up program with protection as to as to their exposure to future legal actions arising out of their projects under state law. As emphasized above however, this endorsement not only states the period to which the completed operations coverage extends into the future, it also unambiguously sets out the point at which the completed operations coverage incepts.

While Endorsement No. 31 is long and somewhat convoluted, it makes clear that the Florida statute of repose is incorporated to trigger the completed operations extension, beginning when the jurisdictional authority issues a temporary certificate of occupancy, a certificate of occupancy, or a certificate of completion for the

---

[11] Doc 96-1, p. 68.
[12] Fla. Stat. § 95.11(3)(b).

building. Where, as here, a project involves multiple buildings, a certificate is issued individually for each building.[13] Endorsement No. 31, together with the Course of Construction Endorsement and the Completed Operations Definition seals the deal as to the completed status of each building in Phase 1 because a certificate of temporary occupancy had been issued for each one prior to the advent of the property damage to them.[14] In addition, and as set out above, the buildings in Phase 1 had been put to their intended use by JM at the time of the occurrence of the property damage and were thus "completed" within the operative Completed Operations Definition.

## V. The Course of Construction Endorsement is a Disingenuous Reduction of Standard CGL Coverage for Contractors

As stated, the Course of Construction Endorsement does not operate in a vacuum. In that regard, Endorsement No. 6 deletes the following exclusions from the policy in their entirety:

A. Exclusion j.(2) Premises you sell, give away or abandon if the "property damage" arises out of any part of those premises.

B. Exclusion j.(5) That particular part of real property on which you or any contractors or subcontractors work indirectly or directly

---

[13] Fla. Stat. § 95.11(3)(b).
[14] *See* footnote 4.

on your behalf are performing operations, if the "property damage" arises out of those operations.

C.   Exclusion k. Damage to Your Product

D.   Exclusion l. Damage To Your Work[15]

This endorsement deletes certain exclusions that typically apply to property damage to a construction project. For example, Exclusion j.(2) is deleted because it would delete coverage for JM, as owner of the premises, in the event it attempted to sell it. In turn, Exclusion k is deleted because a construction project is not regarded as the named insured's product. Further, Exclusion l is deleted because the entire Project is Kaufman's work so that the policy will cover damage to its own work and that of its subcontractors.

## A. The Course of Construction Endorsement Conflicts With Exclusion j.(6) in the Policy

As is the case here, Exclusion j.(5) is usually deleted from a wrap-up policy. It applies to operations claims and excludes coverage for the "particular part" of the property on which Kaufman or any of its subcontractors are working or performing operations if the property damage arises out of those operations. In other words, the scope of Exclusion j.(5) is limited to damage to property upon which the insured is actively performing operations. In *Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557

---

[15] Doc 96-1, p. 35.

F.3d 207 (5th Cir. 2009), the court held that Exclusion j.(5) applied only to the "particular part" of a condominium project upon which operations were actively occurring at the time water damage was occurring. Of course, the Course of Construction Endorsement is much more onerous in that it would exclude coverage for all property damage, and not just the "particular part" upon which a contractor such as Kaufman, or it subcontractors, were working at the time of the occurrence of property damage. At the time of Tropical Storm Eta, there were no active operations being performed on Phase 1 since it had already received its certificate of occupancy and was being put to its intended used by JM.

Endorsement No. 6 is of even greater import to the matters before this Court. That Endorsement does not delete Exclusion j.(6) from the policy, a companion exclusion to the deleted Exclusion j.(5). Exclusion j.(6) is subject to the same "particular part" limitation and applies only to the "particular part" of the property that was defective and had to be restored, repaired or replaced because the named insured's work was incorrectly performed on it. In addition, Exclusion j.(6) expressly states that the exclusion does not apply in the products-completed operations context, so it is also an operations exclusion.[16]

In *Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365 (5th Cir. 2008), the Fifth Circuit held that Exclusion j.(6) was limited and did not exclude

---

[16] Doc 96-1, p. 13.

coverage for damage to an entire aircraft, but only to the aircraft's electrical system on which the insured performed faulty work. *See, U.S. Fire Ins. Co. v. J.S.U.B.*, 979 S.2d 871, 880 (Fla. 2007) (recognizing that Exclusion j.(6) provides coverage for other parts of the construction work in progress); *Westfield Ins. Co. v. Miller Architects & Builders*, 2020 WL 486878, 949 F.3d 403 (8th Cir. 2020) (same).

Exclusion j.(6) remains in the policy, and is not deleted by Endorsement 15, so even if the Course of Construction Endorsement could be distorted to apply (and it does not), only the property damage to the ***particular part*** of the Project that proved defective would be excluded, and not the damage to the entire Project. At the very least, the retention of Exclusion j.(6) and the Course of Construction Endorsement creates an ambiguity that must be resolved in favor of coverage for Kaufman as to the non-defective portions of the buildings, such as the interior, that were damaged by the defective glass installation.

The Course of Construction Endorsement contains an absolute exclusion that would deny coverage to Kaufman for all property damage at the Project arising out of the alleged defective work. This is a significant difference in the scope of coverage. In terms of coverage for property damage occurring during construction operations, though Endorsement No. 6 appears to expand coverage by deleting exclusions from the main body of the policy, in actuality, it reduces coverage due to the elimination of the "particular part" limitation from Exclusion j.(5).

## B. There is a False Dichotomy Between a Builders Risk Policy and a CGL Policy Under a CCIP

Unfortunately, the reduction of CGL coverage under a CCIP for course of construction losses may be overlooked by construction insureds and their insurance broker/agents. Inexplicably, CCIP insurance underwriters may refer to a Course of Construction Endorsement as a "builders risk exclusion," on the dubious assumption that builders risk insurance, rather than liability insurance, should provide all coverage for property damage to the work that occurs during construction operations. The district court appeared to accept this assumption, stating that, "the purpose of a CGL policy is to provide the insured with coverage *after* construction is complete … in contrast to a builder's risk policy, which "provide[s] protection for fortuitous loss sustained during the construction of the building." (emphasis in original, citations omitted).[17]

This an overly simplistic approach that ignores the gaps that often exist as to builders risk coverage, particularly through exclusions for defective workmanship and consequential damages. Coverage for these exposures may be broader under a CGL rather than a builders risk policy, particularly for faulty workmanship as demonstrated by the standard CGL policy. Moreover, a builders risk policy, as a

---

[17] *Omnibus Order,* p. 11-12.

first-party policy, provides no defense to the insured, while that is a standard, if not the most important feature of a CGL policy, particularly within a CCIP policy insuring multiple participants. The Course of Construction Endorsement explicitly states that there is no defense obligation owed to Kaufman as to claims and suits within the exclusion. By no means does elimination of operations coverage under the guise of a builders risk policy provide the construction insured with equivalent alternative protection as under a CGL policy. In many respects, they are truly apples and oranges and the district court was mistaken in adopting this notion.

## Conclusion

While insurance law varies among the states, courts may often apply precedent from sister jurisdictions, particularly as to standard insurance policy language. By reversing the district court, this Court can ensure that the careful demarcation between operations and completed operations coverage will be preserved for all participants in CCIPs, not only for Florida contractors, but all contractors throughout the United States. Moreover, unless Liberty's reliance on its Course of Construction Endorsement is overturned, such misuse could spread among other insurers.

For the reasons set out above, this Court should reverse the Omnibus Order of the District Court and enter an order that the Course of Construction Endorsement does not apply to the property damage that occurred to Phase 1 of the Project, and

that Liberty must defend and indemnify Kaufman.

Respectfully submitted,

 */s/ Patrick J. Wielinski*
Patrick J. Wielinski
Cokinos | Young
One Galleria Tower
13355 Noel Rd., Suite 1375
Dallas, TX 75240
Telephone:  817-635-3620
Facsimile:   817-635-3633
Email:    pwielinski@cokinoslaw.com

*Counsel for Amici Curiae*

**Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements**

This document complies with the word limit of FRAP 32(a)(7) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 6247 words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).

*(s) Patrick J. Wielinski*

Attorney for Amici Curiae

Dated: November 8, 2023